UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GENE A. BILLIOT                          CIVIL ACTION

VERSUS                                   NO: 10-3046

TWO C'S MARINE, L.L.C.                   SECTION: R(3)


ORDER AND REASONS

Before the Court is plaintiff Gene Billiot's motion for partial summary judgment that his employer, defendant Two C's Marine, violated its duty to provide him with prompt medical care.[1]  Because there are no genuine issues of material fact that Two C's Marine breached its duty, the Court grants Billiot's motion.


I.   BACKGROUND

Billiot brought this action on September 13, 2010 against his former employer, Two C's Marine, asserting claims under the Jones Act and the general maritime law.[2]  On the evening of June 18, 2010, Billiot was serving as captain of the STACEY A, a vessel owned and operated by Two C's Marine.  At the time, the vessel was docked in Empire, Louisiana.  Billiot dropped his fork during dinner and began to experience numbness in his right hand.

---

[1]     (R. Doc. 21.)

[2]     (R. Doc. 1.)

Chad Sampay, the deckhand of the STACEY A, testified that he asked Billiot whether Billiot wanted him to call Two C's Marine's owner, Cal Carrier.[3]  According to Sampay, Billiot said no and stated that he would "see how he felt in the morning time."[4]

Billiot alleges that, although the tingling subsided before he went to bed, "[u]pon awakening on the morning of June 19, he discovered that his right arm was 'dead.'"[5]  Billiot testified that, after Sampay helped him out of bed, he called Carrier and told him that he thought he was having a stroke.[6]  Sampay testified that he also called Carrier and told him that Billiot was sick and that his "lip was pulling."[7]  According to Sampay, Carrier asked if Billiot wanted an ambulance, Sampay then asked Billiot, and Billiot responded that he did not want an ambulance, explaining that "he wanted to go to a Thibodaux hospital."[8]  According to Sampay, sometime later, "[t]he dock-man, Mr. Greg," also asked him if Billiot wanted an ambulance.[9]  Sampay testified that Billiot again said that he did not want an ambulance and

---

[3]   (R. Doc. 33-3 at 3.)

[4]   (*Id.*)

[5]   (R. Doc. 1 at 2.)

[6]   (R. Doc. 33-2 at 22.)

[7]   (R. Doc. 33-3 at 7.)

[8]   (*Id.* at 6.)

[9]   (*Id.* at 6-7.)

2

stated that "he was going to wait until Mr. Cal got there because he wasn't going to any different hospital except for a Thibodaux Hospital."[10]

Carrier testified that he left his home in Patterson, Louisiana for Empire at 7:15 a.m. and that, on the way, he called an associate to ask where was the closest hospital in the Belle Chase, Louisiana area.[11]  According to Carrier, his associate told him that "Ochsner would be the closest one."[12]  Carrier further testified that, while driving Empire, he was able to secure a relief captain, Raymond Johnson, for the STACEY A by telephone.[13] Billiot alleges that Carrier stopped along the way to pick up Johnson and that Carrier arrived in Empire around noon.[14] Carrier, however, testified that he drove alone to Empire and that Johnson arrived separately.[15]  Carrier further testified that it took him around three or three and a half hours to reach Empire.[16]  Sampay testified that, when Carrier arrived, Billiot was unable to get into Carrier's truck without assistance, so

---

[10]   (*Id.* at 5.)

[11]   (R. Doc. 33-4 at 5.)

[12]   (*Id.*)

[13]   (*Id.* at 6-7.)

[14]   (R. Doc. 1 at 3.)

[15]   (R. Doc. 33-4 at 8.)

[16]   (*Id.* at 7.)

3

Sampay and Carrier "pick[ed] him up and help[ed] him walk to the truck."[17]  Carrier testified that he and Billiot set out for the Ochsner facility in Gretna, but that, when they were half way there, Billiot informed him that he would rather be taken to Thibodaux because his medical records were there.  He was also concerned that he would "be hospitalized for a period of time and [ ] his family didn't have the means to come back and forth from Thibodaux to Ochsner."[18]  Carrier also testified that he told Billiot that they were "a lot closer to Ochsners than [ ] to Thibodaux," but that Billiot "insisted that we go ahead and go to Thibodaux."[19]  Carrier did nothing further to dissuade him, and Carrier and Billiot arrived at Thibodaux Regional Medical Center at about 3:00 p.m.[20]  Carrier further testified that he violated company protocol by allowing Billiot to determine where he wanted to go for medical treatment, instead of taking Billiot directly to the closest facility.[21]  That protocol, as set forth in Two C's Marine's *A Guide to Policies and Practices*, provides:

> If an employee or passenger is injured in any way while on the vessel, the first and most important step is to obtain medical treatment immediately.  All other details however

---

[17]    (R. Doc. 33-3 at 9.)

[18]    (*Id.* at 10.)

[19]    (*Id.*)

[20]    (R. Doc. 1 at 3; R. Doc. 33-4 at 11.)

[21]    (R. Doc. 33-4 at 12.)

important should wait on this. If treatment is necessary, transport by the quickest method available – call the Coast Guard and an ambulance if necessary.[22]

Billiot asserts that Two C's Marine negligently failed to seek prompt assistance for him "despite the fact that, as the day progressed, he was no longer able to ambulate, and had difficulty speaking."[23]  Billiot alleges that, as a result of Two C's Marine's negligence, he has sustained "severe and permanent personal injury to his body causing great pain and suffering, preventing him from attending his usual occupation, causing past and future wage loss, loss of earning capacity, permanent disability and loss of enjoyment of life."[24]  Billiot now moves for partial summary judgment that Two C's Marine breached its duty to provide him with prompt medical care.  Although Billiot's motion is styled as a motion for partial summary judgment to "fix liability," at oral argument, Billiot's counsel modified the motion to seek summary judgment only on the issue of whether Two C's Marine breached its duty of care to Billiot.

## II.   STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits

---

[22]     (R. Doc. 21-2.)

[23]     (R. Doc. 1 at 3.)

[24]     (*Id.* at 4.)

5

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2738 (1983)).

    If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may

6

not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *Id.* at 325; *see also Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discover and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).


**III. DISCUSSION**

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc).  In *Gautreaux*, the Fifth Circuit clarified that

an employer is liable under the Jones Act if the negligence of its employees or agents played "any part, even the slightest" in causing the injury or death for which damages are sought.  107 F.3d at 335 (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506 (1957)).  At the same time, the employer's standard of care is not greater than that of ordinary negligence under the circumstances.  *Id.* at 339.  A seaman seeking to recover for the negligence of his employer must establish that the employer breached its duty of care, *i.e.*, the care that a "reasonable person" of "ordinary prudence" would exercise.  *Gautreaux*, 107 F.3d at 334-35.  In addition, the seaman's duty of care is not a "slight" duty of care to protect himself from the employer's negligence.  *Id.*  Rather, the seaman is also obliged to act "with ordinary prudence under the circumstances."  *Id.*

Among the duties that a Jones Act employer owes to his seaman employees is the duty to provide prompt and adequate medical care.  *See De Zon v. American President Lines*, 318 U.S. 660, 667-68 (1943) ("The duty to provide proper medical treatment and attendance for seaman falling ill or suffering injury in the service of the ship has been imposed upon the shipowners by all maritime nations.") (quoting *The Iroquois*, 194 U.S. 240, 211 (1904)); *De Centro v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 140 (5th Cir. 1986) ("The legal obligation of a shipowner to attend to the medical needs of its crew is undisputed: A ship owner has

a duty to provide prompt and adequate medical care to its
seamen."). The measure of the duty depends on the circumstances
of each case, including the seriousness of the injury or illness
and the availability of care. *De Zon*, 318 U.S. at 688.
"Although there may be no duty to the seaman to carry a
physician, the circumstances may be such as to require reasonable
measures to get him one, such as turning back, putting in to the
nearest port although not one of call, hailing a passing ship, or
taking other measures of considerable cost in time and money."
*Id.*

Based on the evidence in the record, the Court finds that
Two C's Marine breached its duty to provide Billiot with prompt
medical assistance. Billiot testified that, on the morning of
the incident, he told Carrier he thought he was having a stroke,
and Sampay testified that he informed Carrier that Billiot was
sick and that his "lip was pulling."[25] Given this undisputed
testimony, the Court finds that Carrier was aware of Billiot's
condition and should have known that Billiot required care
quickly. Instead of sending an ambulance or arranging for some
other form of transportation, however, Carrier elected to drive
from his home in Patterson to pick up Billiot to take him to a
medical facility, knowing that the trip to Empire would take at

---

[25]    (R. Doc. 33-3 at 7.)

9

least three hours[26] and that additional time would be required to reach a medical facility.  That Carrier asked if Billiot wanted an ambulance and that Billiot declined did not relieve Carrier of his obligation to ensure Billot was treated promptly.  *See The Iroquois*, 194 U.S. 240, 247 (1904) ("[I]t is a part of [the master's] duty to look out for the safety and care of his seamen, whether they make a distinct request for it or not.").  *Compare McGuire v. Mutual Transit Co.*, 257 F. 360, 361 (W.D.N.Y. 1919) (finding no breach of duty to provide prompt care "in the absence of more serious external symptoms" when the plaintiff declined defendant's offer to provide a physician).  Given the seriousness of Billiot's condition, and that Carrier could have easily sent an ambulance to transport Billiot, the Court finds that Carrier's actions were unreasonable.

Moreover, even assuming Carrier was unaware of the severity of Billiot's condition when he set out for Empire, it should have been apparent to him that Billiot required immediate medical assistance once he arrived.  At that point, Carrier was able to observe Billiot, who could not make it into Carrier's truck without assistance.  Although Carrier testified that he intended to take Billiot to the Ochsner facility in Gretna, Carrier bypassed that facility on Billiot's instruction and drove Billiot to Thibodoux instead.  Billiot did not arrive at the Thibodoux

---

[26]     (R. Doc. 33-4 at 7.)

medical facility until about 3:00 p.m., over seven hours after Carrier left Patterson.  Carrier himself testified that he did not follow company protocol by allowing Billiot to determine where he wanted to go for medical attention and that, as the owner, he "should have taken this matter upon [himself] and just said I'm gonna bring you to Ochsners or the closest possible . . . facility."[27]  Therefore, by his own admission, Carrier did not act with prudence once Billiot was in his control.  His assessment of his conduct is a correct one.  Accordingly, the Court finds that Billiot is entitled to a partial summary judgment on the issue of Two C's Marine's breach of duty.  The Court makes no findings as to the apportionment of fault between the parties or whether Two C's Marine's breach of duty was the proximate cause of Billiot's damages.  Those issues will be addressed at trial.


IV.  **CONCLUSION**

    For the foregoing reasons, Billiot's motions for partial summary judgment is GRANTED.


    New Orleans, Louisiana, this 19th day of July, 2011.

                    _____
                         SARAH S. VANCE
                    UNITED STATES DISTRICT JUDGE

_____

[27]    (R. Doc. 33-4 at 12.)

11